Mr. Justice FIELD
 

 delivered the opinion of the-court.
 

 The schooner Diana was captured, in November, 1862, oft" Cavallo, near the entrance of Matagorda Bay, on the coast of Texas. According to her papers, she was oh a voyage from Campeachy, in Mexico, to Matamoras, at the mouth of the Rio Grande; but at the time of her capture she had been fourteen days at sea and had passed two hundred miles beyond her alleged port of destination. "We have no doubt' that she was then seeking to enter a blockaded port on the coast. The master states in his deposition that .the vessel, if she had not been captured, would have first entered the nearest convenient port, and afterwards gone to Matamoras, and that for twenty-four hours previous to her capture he was steering the vessel.toward the coast in hopes of making a harbor or a beach. One of the seamen testifies that the vessel was running along the coast for an entrance; that at • the time of her capture she was only three miles from the lighthouse on Pass Cavallo Point, and but for the capture would have entered the port of Cavallo.
 

 
 *359
 
 . Nor do we doubt that it was the object of the voyage to ■trade' with the enemy, and for that, purpose that the owners of the .vessel and cargo intended to violate the blockade, The excuse offered by the master for the position in which the vessel was found — that she had been injured by stress of weather, and he whs approaching -the coast with no other motive than that of seeking ‘shelter to repair the damage-r-is inconsistent with, various facts developed by the evidence.
 

 In the first place, the papers of the vessel purport that she was- consigned to one San Roman, at Mhtamoras, but 'the ■instructions from the owners of both vessel and cargo show •that this consignment was colorable, and that the master •was the real consignee. He was clothed with full authority to dispose of the goods on board, and to invest the proceeds in what is very mysteriously termed
 
 the article,
 
 which they had mentioned to him
 
 verbally.
 
 The article to which allusion is thus made, was cotton, which it was undoubtedly the object of the voyage to procure.
 

 In the second place, the articles which composed the cargo were as abundant and cheap at Matamoras as at Campeachy, whilst they were in great demand and of high price in the country occupied by.the enemy.
 

 .In the third place, the vessel had on board, ostensibly as a passenger, but under a fictitious name, an Englishman, who1 was a pilot, and a resident of Lavacca, a town at the head of Matagorda Bay, for which the vessel was evidently directing her course when captured.
 

 . Besides these considerations, which are sufficient of themselves to justify the conclusion that a violation of the blockade was. in the original .intention of the owners of vessel and cargo before the vessel sailed from Campeachy, it was admitted by the master at the time of the capture that it was his purpose to run the blockade, and that he had before attempted, without success, to do so at St. Louis Pass. The Englishman on board, who joined the vessel at Campeachy, also stated that he was engaged to act as. pilot of the vessel to enter. Matagorda Bay, or any other convenient port of Texas.
 

 
 *360
 
 The blockt ;le of the coast of Texas had been established long before the vessel sailed .from Campeaehy, and its existence was generally known. It is proved that if was known to the owners and master of the captured vessel.
 

 ■ There is another circumstance which may be adverted to in this connection. The master of this vessel was also the master of the Sea Witch, which was captured off the coast of Texas for an attempt to violate the blockade, and was released upon the ground, that whilst on a voyage from Matamoras to New Orleans she was driven out of her course by stress of weather and injuries received — an excuse similar to the one offered in this case.
 
 *
 
 This circumstance the court will take notice of, and it will justify a rigid scrutiny into the character of the exculpating testimony produced by the master in the present case. Such is the language of the adjudged cases.
 
 †
 

 vThe statement of the master as to the extent of injuries which thé vessel had received is not supported by the logbook. The injuries which are shown by its entries were not ,of a very serious character — such as would endanger the safety of the vessel. Much less do the entries show the necessity of any deviation of the vessel from a direct course to Matamóras. The statement is, that she deviated from such course on the third day out from Campeaehy, because the sea and wind wTere heavy, and the rigging of the vessel had been, damaged. The log-book shows that the damage was repaired the following morning, and on the next day that the wind was fair for sailing in a direct course to Matamoras, and so continued nearly all the time up to the capture.
 

 It is undoubtedly true that a vessel may be in such distress as to justify'her in attempting to enter a blockaded port. She may be out of provisions or water, or she may be in a leaking condition, and no other port be of easy access. The casé, however, must be one of absolute and uncontrollable necessity; and this must be established beyond reasonable
 
 *361
 
 doubt. “Nothing.legs,’,’'says Sir "William Scott, “than án uncontrollable necessity, which admits of no compromise, and cannot be resisted,” will be held a justification of the offence. Any rule less stringent than this would open the door to all sorts of fraud. Attempted evasions of the blockade would be excused upon pretences of distress and danger,' not warranted by the facts, but. the falsity of winch it would be difficult to expose.
 

 The decree of the court below must be reversed, and that court directed to enter a decree condemning the vessel and cargo as lawful prize; and it is
 

 So ordered.
 

 *
 

 6 Wallace, 242.
 

 †
 

 The Juffrouw Elbrecht, 1 Robinson, 127 ; The Experiment, 8 Wheaton, 261.